Ana Luisa CASTILLO Vda PERDOMO, and Isabel Castillo Bello, Administratrices, Inheritors and Surviving next of kin of the Estates of Dr. Romulo Terrero, Deceased and Hilda Castillo Vda Terrero, Deceased

and

Edward R. Murphy, Administrator of the Estates of Dr. Romulo Terrero, Deceased and Hilda Castillo Vda Terrero, Deceased

v.

ROGER CONSTRUCTION COMPANY et al.

Romelia Aldrey DeSANZ, Administratrix of the Estates of Iris Romelia O'Brien DeTerrero, Romulo Antonio Terrero O'Brien and Iris Margarita Terrero O'Brien, Deceased, and Romelia Aldrey DeSanz, in her capacity as sole inheritor and surviving next of kin of Iris Romelia O'Brien DeTerrero, Romulo Antonio Terrero O'Brien and Iris Margarita O'Brien, Deceased

v.

ROGER CONSTRUCTION COMPANY et al.

Civ. A. Nos. 71–1877, 71–1878.

United States District Court, E. D. Pennsylvania.

Aug. 5, 1976.

Daniel Ryan, Philadelphia, Pa., for cross-claimants.

Thomas Byrne, Jr., Philadelphia, Pa., for defendants on the crossclaim.

## OPINION

EDWARD R. BECKER, District Judge.

### I. *Preliminary Statement*

This case raises an important question of construction of the Uniform Contribution Among Joint Tortfeasors Act ("Act"),[1] apparently one of first impression. Succinctly stated, the question is whether an alleged joint tortfeasor who is the first to settle with the plaintiff and takes in return a joint tortfeasors release[2] is entitled to contribution by way of crossclaim from the other alleged joint tortfeasors who subsequently have separately settled with the plaintiff in return for general releases, in the context where the plaintiff has ultimately settled with all parties against whom the plaintiff has asserted a claim. In that context, no judicial determination of liability or damages, has been or will be made, save only that which would result from a trial on the crossclaim. While we find the answer to the question to be "no" on both statutory and policy grounds, there is a dearth of case law construing the UCAJT Act; hence this opinion.

The case results from an awesome tragedy. On August 1, 1970, Dr. Romulo Terrero, a Venezuelan national, physician, and fellow in pediatric neurology at Jefferson Medical College in Philadelphia, was residing at the Manoa Park Apartments in Haverford Township, Pennsylvania, with his wife, Iris, his children, Romulo Terrero, Jr., and Iris Margarita Terrero, and his mother, Hilda Castillo vda Terrero. On that morning all five Terreros died as the result of inhalation of carbon monoxide fumes emitted from a propane gas generator and an exhaust pipe connection located in Building "E" of the apartment complex, the building in which they resided. The circumstances which allegedly gave rise to liability on the part of the various tortfeasors may be summarized as follows.

On the previous evening, July 31, 1970, an electrical storm occurred in the apartment area, causing a power failure. The failure of power in the apartment complex activated the apartment's emergency generator system. However, when power was restored to the area, the emergency generator system did not shut off as it was designed to do; rather, it continued to operate for another twelve hours until its propane gas supply was exhausted. The continued operation of the emergency generator system produced carbon monoxide fumes, which were supposed to be vented from the building. However, because the generator room was not adequately vented and because the exhaust pipe was covered with earth, the fumes discharged from the exhaust system accumulated in the generator room and seeped into the Terrero apartment, located above, causing the death of the entire Terrero family while they slept.

The administrators of the estates of the decedents brought suit against: (1) Mrs. Edith Friedman, the owner of the Manoa Park Apartments and a principal of Roger Construction Company, the builder of the apartments; (2) Roger Construction Company; (3) David Friedman (Edith Friedman's husband), another principal in Roger Construction Company; and (4) Edward Fernberger, construction superintendent for the building of the apartment (the aforementioned defendants will be hereinafter referred to as the "Friedman interests").[3]

---

1. 9 Uniform Laws Annotated 233 (Thompson ed. 1957). The Pennsylvania Act is codified in 12 Pa.Stat. § 2082 *et seq.*

2. By the terminology "joint tortfeasors release," we mean a release which provides that the liability of the nonsettling parties to the party giving the release is reduced by the amount of the settling parties' pro rata share of the common liability. In our experience such a release is now "boilerplate" in the liability insurance field. It is intended to protect the right of the settling party to later seek contribution. *See* 12 Pa.Stat. § 2086.

3. Plaintiffs also named as defendants a number of the corporations controlled by the Friedman interests, but dismissed as to those parties when it appeared that they were unconnected with the construction or operation of the Manoa Park Apartments. Plaintiffs also dismissed as to two other defendants (Ugite Gas Co. and Adele Jarvis), against whom no semblance of liability could be established, and as to two putative defendants, John Doe # 1, Architect, and John Doe # 2, Landscape Contractor, whose identity could not be established.

Plaintiffs also sued: (5) Anthony S. Bohem, an electrical contractor who installed the allegedly malfunctioning emergency generator system and who did general maintenance around the premises during the construction; (6) Louis D'Anjollel, a plumbing and heating contractor who installed the allegedly defective and improperly covered piping; (7) Main Line Construction Company, Inc., which performed the grading and filling on the building site and was alleged to have been involved in covering the exhaust pipe; (8) Zenith Automatic Controls, Inc., which provided the automatic generator shut off switch which allegedly malfunctioned; (9) Maris Equipment Company and (10) Rose Electric Company, suppliers of the Zenith switch and the generator. A third party complaint was filed by various defendants against Kohler Company, the manufacturer of the generator. Plaintiffs' theories of liability, generally speaking, were that the apartment complex was negligently constructed and maintained, and that the generator system, or component parts of it, were defective and unreasonably dangerous.

In June 1974, after the initial pleadings were closed and extensive discovery completed, the Friedman interests reached a settlement with the plaintiffs which was finalized by the execution of a joint tortfeasors release. This document provided for the discharge of all claims against the Friedman interests arising out of the August 1, 1970, accident, in exchange for the payment of $500,000. The release provided, *inter alia*:

> In the event that it is determined that other persons, firms or corporations were tortfeasors or guilty of liability producing conduct with respect to the deaths of plaintiffs' decedents, *the execution of this release shall operate as a satisfaction of the claims of plaintiffs against such other persons, firms or corporations to the extent of the relative pro rata share of common liability of the persons herein released*; . . . (emphasis added).

> The parties herein released reserve the right to seek contribution from any and/or all other persons, firms and corporations who may have been negligent or guilty of liability producing conduct to the extent that the payment herein exceeds the pro rata share of liability of said persons herein released.

The Friedman interests had theretofore filed a crossclaim for contribution and/or indemnity against the remaining defendants. (The Friedmans are sometimes hereinafter referred to as "crossclaimants.")

At the time this settlement was negotiated and completed, counsel for the other defendants were unable to come to terms with the plaintiffs. Thereafter, in October 1974, and following three days of marathon settlement negotiations conducted in our chambers, we were able to negotiate a settlement among the plaintiffs and the remaining defendants, which was finalized by the execution of a general release. This release included the Friedman interests who by then were crossclaimants; however, counsel for the Friedman interests did not participate in the negotiations for this release.

The consideration for the general release was $760,000.00, of which $500,000.00 was the amount previously paid by the Friedman interests. The actual breakdown of the individual amounts paid as consideration for the two releases is:

| | |
|---|---|
| Friedman interests | $500,000.00 |
| Zenith Automatic Controls | 100,000.00 |
| Main Line Construction | 20,000.00 |
| Rose Electric | 5,000.00 |
| Maris Equipment | 5,000.00 |
| Kohler Co. | 27,500.00 |
| D'Anjollel | 20,000.00 |
| Bohem | 82,500.00 |
| TOTAL | $760,000.00 |

In their crossclaim against the other settling defendants, the Friedman interests seek contribution predicated upon the contention that there is a common liability and that their one-half million dollar payment exceeds their *pro rata* share thereof. The defendants on the crossclaim have filed a

motion to dismiss it for failure to state a claim upon which relief can be granted. Both sides have briefed the legal issues involved.[4] After careful review of the briefs submitted and the applicable law, and for the reasons which follow, we grant the motion to dismiss.[5]

## II. *Discussion*

### A. *Introduction*

■ In Pennsylvania,[6] the scope of the right of a tortfeasor to contribution from its fellow joint tortfeasors is governed by the Uniform Contribution Among Joint Tortfeasors Act of July 19, 1951, 12 Pa.Stat. §§ 2082–89.[7] The Pennsylvania courts do not regard contribution as a recovery for the tort but rather as "the enforcement of an equitable duty to share liability for the wrong done by [the joint tortfeasors]." *Swartz v. Sunderland*, 403 Pa. 222, 223, 224, 169 A.2d 289, 290 (1961).

The portions of the statute which are most relevant to the question before us are 12 Pa.Stat. § 2083, which establishes the right of contribution, and 12 Pa.Stat. § 2085, dealing with the effect of a release.

Section 2083 reads:

*Right of contribution*

(1) The right of contribution exists among joint tortfeasors; (2) A joint tortfeasor is not entitled to a money judgment for contribution until he has by payment discharged the common liability or has paid more than his pro rata share thereof; (3) A joint tortfeasor who enters into a settlement with the injured person is not entitled to recover contribution from another joint tortfeasor whose liability to the injured person is not extinguished by the settlement.

The language of § 2085 is:

*Release, effect as to other tortfeasors*

A release by the injured person of one joint tortfeasor, whether before or after judgment, does not discharge the other tortfeasors unless the release so provides, but reduces the claim against the other tortfeasors in the amount of the consideration paid for the release or in any amount or proportion by which the release provides that the total claim shall be reduced if greater than the consideration paid.

Although § 2083(2) and (3), when read literally, seem only to state when the right of contribution does not exist, rather than when it does, the Pennsylvania Supreme Court has held in *Sunderland* that the right of contribution arises when the two conditions stated in those sections have been met. More precisely, a right of contribution exists if it is shown "(1) that one joint tortfeasor has discharged the common liability or paid more than his pro rata share;" and "(2) that the liability of the other joint tortfeasor to the injured persons has been extinguished by the settlement." *Sunderland*, 403 Pa. at 225; 169 A.2d at 291. By virtue of their motion to dismiss, the defendants on the crossclaim assert that the Friedman interests did not acquire, upon payment of the $500,000. consideration for the joint tortfeasors release, an inherent right of contribution from the other defendants because neither of the Sunderland conditions can be met; i. e.: (1) crossclaimants cannot prove that there was a common liability among all the defendants and that they paid more than their pro rata share thereof; and (2) crossclaimants have not, by obtaining the joint tortfeasors release, extinguished the liability of the defendants on the crossclaim.

We shall address the *Sunderland* conditions seriatim. Because it bears heavily on construction of the Uniform Contribution Among Joint Tortfeasors Act, we will also separately consider the crossclaim defendants' contention that the construction ad-

---

**4.** Both sides waived oral argument.

**5.** We have, of course, for purposes of the motion to dismiss, assumed the truth of all facts alleged by crossclaimants.

**6.** The parties agree that Pennsylvania law is controlling in this case.

**7.** The first uniform act was issued in 1939. A revised version appeared in 1955, but the first one remains in effect in Pennsylvania.

vanced by the crossclaimants would contravene the policy of the Act, and of the law, of fostering settlements or at least not discouraging them.

### B. *The Question of Establishing that the Crossclaimants Have Paid More than their Pro Rata Share*

The crossclaim defendants assert that the first *Sunderland* condition can never be shown to be satisfied when all alleged tortfeasors have settled, as is the case here, because, with the original plaintiff out of the case, there can be no concrete, adversarial, hence reliable factfinding as to whether there was a common liability and as to the amount of damages (hence, whether the settling party has paid more than its pro rata share). As the defendants on the crossclaim put it in their brief:

[T]he future proceedings which [the crossclaimants believe] are appropriate and necessary would, by their very nature, mock the integrity of the judicial process. Bearing in mind, as previously demonstrated, that [crossclaimants] would have to establish both the alleged 'common liability' and the actual amount of plaintiffs' damages, it is obvious that there can be no true adversary adjudication of these issues with plaintiffs out of the case.

■■■ Although we share the qualms of the crossclaim defendants that the process of adjudicating that claim sans plaintiffs would be undesirable, if not untoward, *Sunderland* requires that we reject this argument. In *Sunderland*, one of the alleged tortfeasors obtained a general release and then sued the other alleged tortfeasor for contribution.[8] The lower courts both held that a judgment after trial establishing liability for the wrong was a condition precedent to an action for contribution. The Supreme Court, however, reversed, holding that a joint tortfeasor who settles with the injured party and obtains a release of all

claims against himself and the other alleged joint tortfeasor may successfully sue the nonsettling tortfeasor for contribution, even though no judgment had been entered. The court stated that the nonsettling party would not:

be prejudiced by the fact that judgment has not first been entered in favor of the injured party. [It] will still have [its] day in court with full opportunity to defend against liability and the reasonableness of the amount paid in settlement of the existing claim. . . . The Uniform Act intends that a case involving joint tort-feasors may be fully heard on the merits, without regard to the position of any of the parties as original defendants or otherwise.

403 Pa. at 226; 169 A.2d at 291. Thus, a right of contribution may exist in Pennsylvania even in the absence of a judicial determination of liability and amount of damages in a proceeding in which the injured party participates. As *Sunderland* indicates, the procedure which has judicially emerged for handling such situations is one which imposes on the court adjudicating the contribution claim the burden not of determining the precise amount of damages but only of determining whether the settlement arrived at was reasonable.[9] While *Sunderland* is factually different from the case at bar with respect to the extinguishment consideration (in *Sunderland* plaintiff gave a release to all defendants rather than a joint tortfeasors release), it is not distinguishable with respect to the first question before us—whether a truly adversary trial is necessary to determine pro rata share. *Sunderland* establishes that it is not. Here we would merely be faced with determining the reasonableness of the total of the payments received by the original plaintiffs in settlement, a garden variety judicial undertaking. Thus, the crossclaim defendants cannot prevail because of failure to satisfy the first *Sunderland* condition.

---

**8.** A general release effects a release of all joint tortfeasors.

**9.** Questions of liability and reasonableness of settlement amount cannot, of course, be resolved on a motion to dismiss.

## C. *The Extinguishment Question*

### 1. *Basic Elements*

The crossclaim defendants contend that full extinguishment, not merely the partial extinguishment such as the crossclaiming Friedman interests have effected by obtaining a joint tortfeasors release, is required to meet the second *Sunderland* condition. They cite two cases from states other than Pennsylvania in support.[10] The cases are *Lacewell v. Griffin*, 214 Ark. 909, 219 S.W.2d 227 (1949), and *Rio Grande Gas Co. v. Stahmann Farms, Inc.*, 80 N.M. 432, 457 P.2d 364 (1969). In *Lacewell*, the injured party, a passenger in a bus involved in an accident, settled with the owner of the truck with which the bus collided for $2,625, and then with the bus company for $3,500. Neither alleged tortfeasor obtained a release of the other. The bus company sued the truck owner for contribution. The court found that neither party would be entitled to contribution under the circumstances, since

> [e]ach tort-feasor settled his liability separate and distinct [sic] from the other, and without attempting to gain any benefit for the other; . . . .

219 S.W.2d at 230.

In *Stahmann*, the party seeking contribution compromised and settled the judgment entered against it and sought contribution from an alleged joint tortfeasor in a third party action. The court, noting that the defendant in the third party action was not released by the settlement, found that there was no right to contribution.

The crossclaiming Friedman interests contend that both *Lacewell* and *Stahmann* are distinguishable because in neither of those cases did the party seeking contribution obtain a joint tortfeasors release, as they have here. We agree. They refer us to a Pennsylvania case in which the Superi-

or Court awarded contribution to a settling party who obtained a joint tortfeasors release. *Mong v. Hershberger*, 200 Pa.Super. 68, 186 A.2d 427 (1962).

Mong was the driver of a car involved in a collision with two other cars, one driven by Dougherty and one driven by Hershberger. Dougherty and his six passengers settled with Mong, giving him a joint tortfeasors release. The Dougherty group then brought suit against Hershberger. Hershberger refused to settle and the case proceeded to trial; the plaintiffs won. In accordance with 12 Pa.Stat. § 2085,[11] the Pennsylvania Supreme Court reduced the amounts that Hershberger had to pay to the victims by the amount of the consideration paid by Mong for the release; as a result, Mong in effect had paid more than his proportionate share of the common liability. *Dougherty v. Hershberger*, 386 Pa. 367, 126 A.2d 730 (1956). Mong then sued Hershberger for contribution. The court, finding that "extinguish" does not "necessarily mean an abrupt or complete elimination of . . . rights or claims," 200 Pa.Super. at 72, 186 A.2d at 429, held that Mong (who had obtained only a joint tortfeasors release) was entitled to contribution "regardless of whether [the claims] were completely or only partially extinguished; . . . ."

Whether or not *Mong* represents a desirable result in terms of uniform construction of the UCAJT Act,[12] *Mong* is the law of Pennsylvania by which we are bound in this case. It establishes as a matter of Pennsylvania law that a settling party who obtains a joint tortfeasors release *may* be entitled to contribution. We underscore *may*, because *Mong* is factually distinguishable from the case at bar and does not, unless it is given a broad reading, conclude the issue of whether there has been an

---

10. 12 Pa.Stat. § 2088 states that the Pennsylvania Act "shall be so interpreted and construed as to effectuate its general purpose to make uniform the law of those states that enact it."

11. See p. 532 *supra* for the full relevant language of the statute.

12. We can find no cases from other UCAJT Act jurisdictions on this point. The *Mong* construction departs from the literal terms of the Act and may or may not be followed elsewhere.

extinguishment here. To understand why *Mong* is distinguishable, we will have to undertake a closer analysis of the extinguishment concept. Before doing so, however, we find it helpful to consider one of the most forceful arguments advanced by the crossclaim defendants in support of their motion to dismiss—the policy argument. While we obviously cannot and will not make a determination of this case on policy grounds alone, an analysis of policy considerations is necessary to an understanding of the statutory construction issues before us and will be helpful in assaying the type of reading to be given to *Mong*.

### 2. Policy Considerations—Impact Upon Settlements

The crossclaim defendants argue that allowing contribution in cases such as this one will discourage settlement of multidefendant cases, because after one defendant settles, the others, unwilling to pay both the plaintiff and the settling defendant, will prefer to go to trial, rather than settle. Indeed, the crossclaim defendants argue—perhaps *in terrorem*, though we are not sure that such a characterization of their argument is justified—that institutionalizing the right to contribution in these circumstances would wreak havoc in the insurance industry, and concomitantly in the courts, in their efforts to dispose of personal injury claims involving multiple defendants. Crossclaimants contend, on the other hand, that allowing contribution will encourage all parties to settle at the same time.

To evaluate the relative merits of the parties' positions on this issue, we must first consider the reasons why parties settle and then analyze the impact of allowing contribution on those motivations. The motivations for settlement by defendants may in general be summarized as threefold (in order of descending importance): (1) to avoid the risk of payment of a potentially larger sum in damages if they are found liable; (2) to eliminate the expense of further proceedings, including trial; and (3) to avoid the possibility of a *formal*, adverse judicial determination such as a finding of fault.

In the situation where one party has settled and obtained a joint tortfeasors release, whether contribution is allowed does not alter the risk that a large judgment will be entered against a non-settling defendant. However, the attitude of the alleged tortfeasor who has not yet settled but is tempted to, will doubtless be affected if he knows that, even if he settles with the plaintiff in return for a general release, he will also be liable for a claim for contribution to the first defendant to settle. This prospect is enhanced by the fact that Pennsylvania has not adopted § 2(4) of the original Uniform Act, 9 U.L.A. at 235, which requires that relative degrees of fault be considered in determining pro rata shares. Thus, although settlements, in our experience, tend to follow the lines of relative culpability, the Act makes all joint tortfeasors equally liable, hence the enhanced prospect of a contribution claim with the attendant cost of defense.

In probabilistic terms, the alleged tortfeasor will only wish to settle if his total payments to the injured party and settling defendant will be equal to or less than the expected amount that he would have to pay if he did not settle (expected amount = pro rata share of damages x probability of plaintiff's verdict). If contribution is allowed and one tortfeasor pays in settlement more than the other's expected amount, then the non-settling tortfeasor's expectation would be, if he did not settle, that he would have to pay both the injured party and the settling tortfeasor. He would then be unwilling to make a payment equal to his expected amount to the injured party alone. He would make a smaller offer to the injured party, which, of course, the injured party would be less likely to accept. We say this cognizant of the fact that the plaintiff, having settled with the first tortfeasor, may have lesser settlement needs and demands, believing it more likely that,

with the security of one settlement in hand, the injured party may be ready to "go for broke," hence be harder to deal with. Thus, it is less likely that there will be a meeting of the minds between the injured party and the non-settling alleged tortfeasor if contribution is allowed in a situation like that at bar.

Crossclaimants have contended that allowing contribution in this situation is, as a policy matter, desirable, since it will encourage the parties to settle all of their claims against each other at one time. In their view, no doubt, our probability analysis is irrelevant for this reason. In our experience, however, things just do not happen that way in the real world. It is always much less likely that three or more parties will come to a meeting of the minds than that two will.

The second and third motivations for settlement will also lose force if contribution is allowed, since the nonsettling tortfeasor would face the possibility of a contribution proceeding with its attendant costs and potential judicial determination of fault. In a case like the present one the costs of defense can be staggering. The later-settling tortfeasor could, of course, figure on settling with the crossclaimant also, but, as we have already discussed, he will then reduce the amount that he is willing to pay the injured party, making settlement with the latter less probable.

Based on this analysis, and long experience in this field, we conclude that the crossclaim defendants are correct that the chances of settlement will be reduced if contribution is allowed. Indeed, we believe that, were the principle for which the crossclaimants are contending to become established, it would have a serious adverse impact upon the settlement of multidefendant cases. The policy of the law in favor of negotiated settlements is clear. Policy considerations thus strongly inveigh against the result sought by the crossclaimants.

### 3. The Extinguishment Dilemma Resolved

There is no doubt that where the first tortfeasor to settle obtains a complete extinguishment of the claims of the plaintiffs against the remaining tortfeasors, he has conferred upon them a real and direct benefit which should entitle him to contribution, i. e., removal of the principal hazard of trial—a large plaintiff's verdict. This is the situation in *Sunderland*. While *Mong* demonstrates a situation where the Pennsylvania courts have conferred the right of contribution upon a tortfeasor who has not completely extinguished the rights of the plaintiff against his co-tortfeasors, we believe *Mong* to be an exception which proves the rule.

In *Mong*, the settling tortfeasor (Mong) paid a total of $13,000.00[13] to the injured parties. Judgment was thereafter entered in the amount of $11,720.99 in favor of these same parties in an action defended by Hershberger. Plaintiffs argued that they were entitled to $5,860.50, or one half of the judgment, from Hershberger. The Supreme Court, however, relying on the portion of § 2085 which states that the amount which must be paid by the losing party shall be reduced by the greater of the amount stated in the release and the amount of consideration paid for the release, reduced the amount Hershberger had to pay to $1,839.26, since some of the victims were paid more than half of the amount of their judgments by Mong. Mong thus conferred a real and direct benefit upon Hershberger in the amount of $4,021.33, which is the difference between one half of the judgment and the amount that the court ultimately required Hershberger to pay. Part of Hershberger's actual obligations to the plaintiffs was thus paid for him. This direct benefit accrued to Hershberger because the release was obtained by Mong, though we are only able to say that such a benefit accrued to Hershberger because of the outcome of the Hershberger case.

---

**13.** In *Dougherty*, the total was reported as $13,500.00. 126 A.2d at 732. This difference does not affect our analysis.

Moreover, in terms of the contribution proceeding, once Hershberger, having elected not to settle but to go to trial, had been adjudicated a tortfeasor, the contribution proceeding was merely a matter of mathematics: both Mong (by admission) and Hershberger (by verdict) had been determined to be tortfeasors, and the plaintiffs' damages had been established by the verdict, so the determination of pro rata shares was a matter of simple calculation, not of complex or even simple trial.

■ In our view, the extinguishment condition requires that the settling party must confer a real and direct benefit upon the nonsettling parties. Only upon the accrual of such a benefit does equity recognize a right of contribution. Obviously, when the settling party obtains a general release, as in *Sunderland*, such a benefit is conferred. The nonsettling party is totally freed from his obligations to the injured party. When only a joint tortfeasors release is obtained, however, it is unclear at the time of settlement whether the nonsettling defendants will gain any benefit from the release. The reason this is true will become even clearer upon consideration of a simple hypothetical. Suppose that one alleged tortfeasor settled and obtained a joint tortfeasors release, while the other one proceeded to trial. Unlike Hershberger, however, our hypothetical defendant wins. Surely, the legislature did not intend in enacting the Uniform Act that the settling tortfeasor could relitigate the issue of whether the victorious defendant was liable because the settling tortfeasor gained an unconditional right of contribution at the time of settlement. The victorious defendant who freed himself from liability by winning a verdict gained no benefit from the release, and the right of contribution is cut off. We thus conclude that where the first party to settle obtains a joint tortfeasors release, the right of contribution is an *inchoate* one which may ripen into an enforceable right if subsequent events reveal that a real and direct benefit was conferred upon the nonsettling party. In *Mong*, the plaintiffs' verdict against Hershberger and the act of the judge in making the § 2085 reduction through a simple calculation (as opposed to a complex trial) caused Mong's right of contribution to ripen.

Our inchoate-ripening theory is coextensive with the conferring of a real benefit concept we articulated above. However, where a joint tortfeasors release is involved, the vantage point for determining whether a real benefit was conferred may be retrospective. In this present case, we could only speculate upon whether any benefit at all was gained by the crossclaim defendants from the procurement of the joint tortfeasors release by the crossclaimants in view of their exposure to a costly trial and a large verdict if they did not settle. No real and direct benefit was then conferred. Had the crossclaim defendants voluntarily gone to trial against the plaintiffs and lost, then the situation would have been akin to *Mong*, where the contribution proceeding was a mere mathematical exercise. But here, in the wake of the crossclaim defendants' settlement, by which they freed themselves from the risk of a large judgment and also (they believed) from the cost of litigation through their own efforts in bargaining to an acceptable amount with plaintiffs, the contribution trial would be nonetheless a major undertaking and most expensive. Retrospectively, then, the Friedman interests' settlement conferred no benefit upon them at all, or at best scant benefit;[14] the crossclaimants' inchoate right of contribution not only did not ripen, it disappeared.[15]

---

14. It is important to repeat also that the fact of the initial settlement does not necessarily mean that the remaining defendants got "off easier" because of the "go for broke" philosophy which can thus prevail. Moreover, having mediated the settlement, we do not believe that the crossclaim defendants here "got off easy,"

i. e., were spared heavy obligations by reason of the crossclaimants' earlier settlement.

15. The crossclaimants have argued that there was a benefit and thus an extinguishment at the time of settlement because prior to the procurement of the release the crossclaim defendants could have ended up paying the in-

In sum then, in terms of the extinguishment concept, which is the legal framework for this discussion, giving a narrow reading of *Mong*, which we believe is dictated by notions of statutory construction as well as of policy, we do not believe that the Friedman interests extinguished the claim against the crossclaim defendants when they concluded their settlement. Moreover, contribution is an equitable doctrine. *Sunderland, supra.* It would be inequitable to permit the Friedman interests to pursue a crossclaim against those upon whom they conferred no clear benefit at the time of their settlement (leaving them still monumentally exposed) where, from a retrospective vantage point, *all* those crossclaim defendants have now settled, but would nonetheless, if the crossclaimants are correct, be obliged to mount a costly, protracted and difficult defense of the crossclaim.[16] Because the inchoate right of contribution thus did not ripen, the motion to dismiss the crossclaim must be granted.

jured party for all of their damages, while after the release was obtained they could be liable for at most half. While we have shown in text and footnotes *supra* why the procurement of the joint tortfeasors release is not enough to gain an unconditional right of contribution, we also note the following. With two exceptions which we shall discuss, each alleged tortfeasor, prior to the procurement of a joint tortfeasors release, would anticipate, given the right of contribution, that he would end up paying no more than his pro rata share of the victim's damages. The procurement of the joint tortfeasors release does not change this expectation. In other words, it provides no clear and concrete benefit to the nonsettling tortfeasor. The first exception applies to the case where the settling tortfeasor is clearly not liable and the nonsettling tortfeasor clearly is. In such a case, prior to the procurement of the release, the nonsettling tortfeasor would have expected to pay the victim for all of his damages, while after, his obligation is reduced to half. A benefit is thus conferred. The second exception is a situation in which the settling tortfeasor, though clearly liable, would have been unable to pay its full share and thus the nonsettling tortfeasor would have expected to pay in excess of his pro rata share to make up for the financial limitations of the settling tortfeasor. The procurement of the release in such a situation would also reduce the expected obligation of the nonsettling tortfeasor, so that a benefit is conferred. Based upon knowledge of the case, it appears clear to us that neither of these exceptions are applicable here. But even in a case where we lacked such confidence, it would be pure speculation to say that a benefit was conferred based on the mere fact that a joint tortfeasors release was obtained, and we would not base the equitable right of contribution on such speculation.

16. The difficulty is increased, of course, because of the absence of the plaintiffs. We add that our holding is limited to the situation where all the defendants have settled with the plaintiff. We express no view about a situation where, regardless of how many crossclaim defendants have settled with the plaintiff, there is a remaining nonsettling crossclaim defendant, because of whose presence, the case must go to trial against the plaintiff (and typically, against other defendants against whom the remaining defendant has asserted a crossclaim).